Thomas L. Strickland (*pro hac vice forthcoming*)
thomas.strickland@wilmerhale.com
David W. Bowker (SBN 200516)
david.bowker@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile: +1 202 663 6363

Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
Alix Pisani (SBN 312263)
alix.pisani@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400

*Attorneys for Plaintiff Vanguard Logistics Services (USA), Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANGUARD LOGISTICS SERVICES (USA), INC.<br><br>Plaintiff,<br><br>v.<br><br>FRASER ROBINSON AND BEACON TECHNOLOGIES, LTD.<br><br>Defendants. | **CASE NUMBER:** 2:20-cv-09880<br><br>**COMPLAINT FOR (1) INTENTIONAL MISREPRESENTATION AND FRAUD; (2) MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836; (3) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. CIVIL CODE § 3426, ET SEQ.; (4) BREACH OF CONTRACT (CONSULTING AGREEMENT);(5) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (6) BREACH OF CONTRACT (NDA/NON-COMPETE) (7) BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY; (8) PROMISSORY ESTOPPEL; (9) INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE; AND (10) VIOLATION OF CAL. BUS. & PROF. CODE § 17200**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1. This is an action by Vanguard Logistics Services (USA), Inc. ("Vanguard" or "the Company")—a full-service logistics and shipping-services company based in Long Beach, California—against Fraser Robinson ("Robinson") and Beacon Technologies, Ltd. ("Beacon") (collectively, "Defendants") for intentional misrepresentation and fraud, misappropriation of trade secrets under the Defend Trade Secrets Act, misappropriation of trade secrets under the California Uniform Trade Secrets Act, breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty and the duty of loyalty, promissory estoppel, intentional interference with a prospective economic advantage, and unfair and deceptive business practices in violation of California Business and Professions Code section 17200. It is based upon an unlawful scheme by Robinson who, upon information and belief, deceptively used his positions of trust as a consultant, advisor, board member, and fiduciary to gain access to, and steal, Vanguard's most valuable property—including its transformational digital technology, prototypes, algorithms, data, intellectual property, trade secrets, and other proprietary information—which Robinson used to create Beacon, a copycat competitor that has used Vanguard's stolen assets to cause further, ongoing harm to Vanguard's business.

2. Founded nearly fifty years ago, Vanguard is a global leader in logistics, freight consolidation, and shipping services, with decades of experience, partnerships built on trust and reliability, a commitment to innovation and efficiency, and an unrivaled global network to provide a full array of end-to-end, door-to-door shipping solutions and related services. Vanguard's ultimate beneficial owners, the Mansour family. Vanguard's Board of Directors and Digital Steering Committee are shared with two of the

Mansour's holding companies, OTS Midco Limited and OTS Topco Limited (together, "OTS").

3.     Robinson is a British salesman, marketer, and consultant.  Before he stole from Vanguard to start Beacon, he had worked as the "Head of Business" for Europe, the Middle East, and Africa for the notoriously aggressive ride-hailing company Uber Technologies Inc., which used its revolutionary digital technology to disrupt the vehicle-for-hire industry and take market share from taxi companies and others.  In late 2017, Robinson went looking for other "opportunities," as he was being replaced at Uber following the departure of Uber CEO Travis Kalanick.  On information and belief, Robinson had become interested in the logistics and shipping industry earlier that year, in March 2017, when his then-employer Uber launched Uber Freight, a digital truck-hailing service for ground shippers.  As Robinson would later tell a reporter, that was when he first started "research[ing] the topic," "learn[ing] more about logistics and how goods move around the world," and planning his startup.[1]  Robinson's problem was that he lacked the industry expertise, operational experience, data, technology, and other information he would need to get started.  Rather than invest the time and resources to acquire it lawfully, however, upon information and belief, Robinson opted instead to steal it from an existing logistics and shipping company.  His strategy—as he later let slip to the same reporter—was to "spen[d] time inside" such a company obtaining the information he would need to create Beacon.

4.     In or around November and December 2017, Robinson found such a company in Vanguard.  He initiated contact through Vanguard's owners—the Mansours—a well-respected, highly-successful family whose global conglomerate The Mansour Group spans three generations, employs more than

---

[1] *See* "Digital forwarder Beacon sheds light on its finance USP," AirCargo News, Feb. 9, 2020, https://www.aircargonews.net/people/interviews/digital-forwarder-beacon-shines-a-light-on-its-finance-usp/.

COMPLAINT

60,000 people worldwide, and generates gross annual revenues in excess of $7.5 billion.  When Robinson presented himself on their doorstep, they were already in the process of implementing an exciting new business plan for Vanguard.  As part of that plan, they had already adopted a groundbreaking digital strategy for the logistics and shipping industry; already made substantial investments in the development of cutting-edge digital technology; already launched the online platform "ADESSO" (https://portal.vanguardlogistics.com/apps/ui/#/adesso); and were on the verge of transforming Vanguard into one of the world's first fully-digital door-to-door shipping services companies with global reach.  Vanguard and the Mansour family had also created a technology company, JiffyShip Cargo Technology Solutions Private Ltd. ("JiffyShip"), which was helping Vanguard develop and deploy digital technologies, including but not limited to secret prototypes of a cutting-edge, one-stop online platform designed to build upon and expand ADESSO, *e.g.*, by enabling Vanguard's customers to price, book, purchase, track, trace, and manage worldwide door-to-door shipping and related services in real time with an easy-to-use digital dashboard.  The objective was to "go to market" with the new prototypes and new branding in an effort to leverage the new online platform and digital business to help Vanguard expand the scope and reach of its business to include new customers, new suppliers, and new services.

5.      At the time, the traditional Non-Vessel-Operating-Common-Carriers (also known as "NVOCCs") or Freight Forwarders did not have comparable digital capabilities for their customers.  And Vanguard's primary competitors in the digital realm were only regional in scope, and did not have Vanguard's unique combination of assets and advantages.  Vanguard and its owners had their own technology company to help develop and enhance Vanguard's unique and valuable technology, intellectual property ("IP"), and trade secrets.  Together, they had created secret and proprietary digital infrastructure, prototypes,

-4-

processes, algorithms, big-data analytics engines, and other technology, in furtherance of Vanguard's digital strategy. Vanguard had also amassed the necessary big data to run the analytics engines, thanks to years of operations and the information that comes from it. And Vanguard was in a unique position to combine these assets with decades of operational experience, ample capital for investment and financing, and the necessary global network of vendors, loyal customers, relationships, knowledge, and expertise to make it all work in practice. Moreover, Vanguard had the requisite experience and knowledge of the complex door-to-door value chain, from shippers to receivers, all around the globe—including inland transportation, insurance, custom clearance, ocean freight, airfreight, freight forwarding, warehousing, dispatching, delivery tracking, and the wide range of related services—as necessary to leverage the new technology to attract a broader scope of business and customers.

6.     In contrast, Robinson had none of these assets and advantages before he took them from Vanguard and its owners. Robinson came to the Mansours in late 2017, without any experience in logistics, freight forwarding, or shipping services. He told the Mansours at the time that he knew nothing about Vanguard's business, operations, network, or cutting-edge technology. This was not the only thing he lacked. He came with no capital, no assets, no technology, no trade secrets, no intellectual property, and no experience in the field of logistics and shipping. His pitch to the Mansours was that he used his business development and marketing skills to help Uber leverage its technology to rapidly expand market share and radically disrupt the ride-hailing industry throughout Europe, the Middle East, and Africa—and that he could do something similar for Vanguard.

7.     Robinson promised the Mansour family and Vanguard that they could count on him to help shape, market, and sell Vanguard's cutting-edge, online digital platform, as part of the Mansours' plan to expand Vanguard's

global business.  Robinson gained their trust and confidence—along with access to their key people, plans, prototypes, data, documents, customers, suppliers, brokers, technology, IP, trade secrets, and other assets—by making numerous oral and written promises and commitments.  For example, he signed an NDA and non-compete agreement in which he vowed among other things to (1) keep the information he obtained secret and confidential, (2) use the information only for the performance of his official duties, (3) destroy or return the information upon request, (4) refrain from contacting those to whom he was introduced for reasons unrelated to his duties, and (5) refrain from competing "in the creation of a Digital solution" for the freight and logistics industry.  He also negotiated a consulting agreement and assumed fiduciary duties by becoming a member of the board of directors and a member of the Company's "Digital Steering Committee."  In each of these capacities, he led the Mansours and the Company to believe that he would be serving the Company's best interests and helping to shape, implement, and market its digital strategy.

8.     Having made these commitments and taken fiduciary positions of trust and confidence within the Company, Robinson gained open access to the Company's key people, plans, prototypes, data, documents, customers, suppliers, brokers, technology, IP, trade secrets, and other assets.  The Company's owners and personnel spent countless hours teaching Robinson the logistics and shipping industry, detailing the digital strategy and plans, introducing members of the Vanguard network, sharing IP and trade secrets, disclosing data and analytics engines, sharing predictive pricing algorithms, and explaining and demonstrating new online platforms, prototypes, and digital technologies.

9.     On information and belief, to help him gather, copy, and take all this proprietary information, Robinson brought in a Russian businessman named Dmitri Izmailov ("Izmailov"), the "co-founder" of Beacon and Robinson's former business associate at Uber who had helped that company lead an

aggressive and disruptive expansion of its business in Russia, while Robinson was doing the same in Europe, the Middle East, and Africa.  Robinson told Vanguard and its owners that Izmailov was there to help Robinson perform his work for the Company and that Izmailov supposedly was a candidate to serve in a "C-Suite" role in Vanguard's digital business.  Robinson and his agent, Izmailov, continued collecting information about Vanguard's business, studying its digital strategy and plans, interviewing key employees and members of its network, and copying its plans, prototypes, data, documents, technology, IP, trade secrets, customer lists, and other confidential information.  As a result of the false promises and deceptive commitments Robinson made to the Mansour family and Vanguard, they trusted him with their most confidential and proprietary information.  Robinson and Izmailov were able to learn the details of the complex door-to-door value chain, while obtaining customer lists, supplier lists, subcontractor lists, infrastructure details, proprietary technology, trade secrets, and other confidential information.

10.   As a director on the board, internal committee member, consultant, and advisor, Robinson had fiduciary and contractual obligations to act in the best interests of Vanguard and maintain the confidentiality of everything he obtained and learned from it, its owners, its agents—including its technology developers at JiffyShip—as well as its network, and its personnel.  He was also obligated to perform his work for Vanguard—and to use what he obtained and learned from Vanguard and the other Mansour companies—only in accordance with his contractual, common law, and statutory duties.  Instead, on information and belief, Robinson defrauded and preyed upon Vanguard, taking what he could from its officers, employees, and networks; copying and taking data, documents, trade secrets, IP, technology, strategic plans, business plans, customer lists, supplier lists, business partner lists; trying to lure away officers; and even

misappropriating its color scheme and website design from then-secret prototypes—all in violation of his commitments and applicable law.

11.   Even as he stole Vanguard's ideas and property and secretly worked with Izmailov to create and prop up a copycat company—Beacon—Robinson continued his charade as a consultant, advisor, director on the board, and member of the Digital Steering Committee for Vanguard.  While still serving in these roles at Vanguard, in or around September 2018, Robinson sought to renegotiate the terms of his engagement, including for example by attempting to reposition himself as a "C-suite candidate," "co-founder," and/or "co-owner." Although he contributed no capital, no assets, no experience, no technology, no proprietary information, no customers, no suppliers, no network, and no business to the enterprise, he claimed that he should be entitled to substantial equity in Vanguard's new digital business.  Robinson did so while he still had contractual, statutory, and common law duties to Vanguard and the Mansour companies, even as he delayed implementation of its digital strategy by demanding and purporting to negotiate for some future leadership role and a percentage of equity in Vanguard's new digital business.

12.   Meanwhile, in flagrant breach of his contractual, statutory, and common law duties—including duties of confidentiality, non-disclosure, non-competition, and all the duties that come with being a fiduciary—on information and belief Robinson and his agent Izmailov secretly continued stealing from Vanguard, creating Beacon, and transferring to Beacon all of the stolen property from Vanguard, including its secret plans, prototypes, data, documents, technology, IP, trade secrets, and other proprietary information.  As Robinson dragged out the negotiations over equity in the business, he used the extra time to

steal yet more trade secrets, IP, technology, and other confidential and proprietary information.

13.    In one particularly brazen example of apparent theft in October 2018, when Robinson still owed contractual and fiduciary duties to Vanguard, he used an email account that he had secretly created for Beacon—*i.e.*, "fraser@beacon.co"—to gain access to and copy secret, proprietary information on a confidential document-sharing site used only by Vanguard and its technology developers at JiffyShip.  Just a few weeks later, Robinson secretly incorporated Beacon in the United Kingdom.  Soon thereafter, Robinson publicly launched Beacon and unveiled its new website, featuring a mission statement, business model, digital solution, online platform, and website design modeled on the confidential information, plans, and prototypes he had stolen from Vanguard.

14.    To add insult to injury, Robinson staked out Vanguard's home state of California to market Beacon to investors and, on information and belief, customers, suppliers, subcontractors, and possibly some in Vanguard's own network.  Beacon's website proudly touts its connections to California, for example, by highlighting its most famous "Series A" investors in California, including leading California-based "venture capital funds" "expa," "Neo," and "8VC," as well as California-based "founders and C-level executives of Uber (e.g., founder and former CEO Travis Kalanick) and Google (e.g., founder and former CEO Eric Schmidt).

15.    Vanguard brings this action against Defendants Robinson and Beacon for severe, ongoing, and irreparable harm caused by their fraudulent misconduct, unfair and deceptive business practices, breaches of contract, breaches of fiduciary duty and loyalty, breaches of confidence, theft of trade secrets and proprietary information, and other misconduct in violation of federal Defend Trade Secrets Act, California's Uniform Trade Secrets Act, and California contract and tort law, as set forth in more detail below.

COMPLAINT

## THE PARTIES

16.     Vanguard Logistics Services (USA), Inc. ("Vanguard") is a California Corporation with its principal place of business at 5000 Airport Plaza Drive Suite 200, Long Beach, California 90815.

17.     On information and belief, Beacon Technologies Ltd. ("Beacon") is a company incorporated in the U.K. on November 7, 2018, doing business under the name Beacon, and registered in England and Wales, with company number 11664346 and VAT number 323 0540 51.  Its registered mailing address is 42 Berkeley Square. London, United Kingdom, W1J 5AW.  On information and belief, Beacon maintains the website located at https://beacon.com/.  On information and belief, Beacon has U.S.-based directors, U.S.-based investors, and has attempted to register certain patents or trademarks with the U.S. Patent and Trademark Office.

18.     Fraser Robinson is an individual.  On information and belief, he resides in London, England and is the CEO and Co-Founder of Beacon.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.

20.     This Court has subject matter jurisdiction on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action alleges violations of 28 U.S.C. § 1836, *et seq*., the Defend Trade Secrets Act of 2016. This Court has supplemental jurisdiction and therefore subject matter jurisdiction over all additional claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over each of the Defendants consistent with the requirements of the Due Process Clause of the U.S. Constitution and the law of this forum because, *inter alia*, (1) they purposefully directed their activities at this forum and at Vanguard, a corporation based in this forum, and at investors, customers, and vendors in this forum; Robinson formed,

-10-

failed to perform, and breached contracts with and for the benefit of Vanguard, a corporation based in this forum; Robinson assumed and breached fiduciary duties to and for the benefit of Vanguard, a corporation based in this forum; Defendants targeted, identified, gathered, and stole intellectual property, trade secrets, and other assets located in this forum and belonging to Vanguard, a corporation based in this forum; they continue to raise capital in this forum so, on information and belief, that they can hire away Vanguard's employees in this forum, do business with its customers in this forum, and take Vanguard's market share in this forum, all with the benefit of misconduct they committed in this forum and property they stole in this forum, and (2) the claims in this case arise out of and relate to the Defendants' activities in this forum; and (3) the exercise of jurisdiction over Defendants comports with fair play and substantial justice because it is reasonable under the circumstances.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and injuries giving rise to the claims occurred in this District; a substantial part of the property that is the subject of this action was situated in, and stolen from Vanguard in, this District (or was developed and/or maintained for the benefit of Vanguard, which is located in this District); and/or such property was subsequently trafficked and otherwise used by Defendants in this District; all as set forth herein.

## FACTUAL ALLEGATIONS

### Background on Vanguard and Its Owners, the Mansour Family

23.    Vanguard has been a logistics and shipping-industry leader for nearly half a century.  It was, and continues to be, an innovator and founder of the less-than-container-load ("LCL"), ocean-freight industry.  In 2012, the Mansour family acquired Vanguard as part of a long-term plan to establish a presence in the industry and further invest in and develop Vanguard's global logistics and shipping-services business.  The Mansours are a self-made family whose

COMPLAINT

1  multinational conglomerate—The Mansour Group—includes family businesses
2  first established in Egypt three generations ago.  The Mansour family is highly
3  respected worldwide for their integrity, loyalty, and business success.  They are
4  among the largest dealers in the world of well-respected U.S. companies like
5  Caterpillar and General Motors.  The Mansours' businesses include Vanguard
6  and JiffyShip, the technology company they created to help develop and deploy
7  Vanguard's online digital strategy.

8      24.   Like all Mansour businesses, Vanguard and JiffyShip embrace,
9  benefit from, and reflect the Mansour family's reputation for and commitment to
10  business integrity, operational excellence, investment in people, innovation, and
11  industry-leading companies.  With the backing, organizational expertise, and
12  business acuity of the Mansour family and its companies, Vanguard has built one
13  of the sector's largest and most successful shipping and logistics networks with
14  unrivaled global reach—including a presence in 35 countries and counting, 16 of
15  its own managed warehouses, and partnerships with ocean carriers, inland
16  logistics providers, and warehouses around the world.  Over many years,
17  Vanguard has cultivated deep expertise in international logistics and shipping
18  services, and now has more than 3,300 dedicated experts in its global network.

19      25.   In or around 2015, Vanguard and its owners began planning to
20  develop and deploy an industry-leading digital platform with the potential to
21  revolutionize certain aspects of the global logistics and shipping-services
22  business.  The concept as envisaged by Vanguard and its owners was to develop
23  the very first global, fully-digital, end-to-end, door-to-door logistics and
24  shipping-services company.  To that end, Vanguard and its owners developed
25  Vanguard ADESSO (https://portal.vanguardlogistics.com/apps/ui/#/adesso), an
26  online digital platform that allows for door-to-door "all in" pricing, instant
27  quotes, immediate booking, easy payment, real-time tracking, and a user-friendly
28  interface.  The ADESSO system was operational before Robinson arrived at the

COMPLAINT

Company.  The Mansours also created the technology company JiffyShip to help Vanguard further develop and globally market its digital infrastructure, big-data analytics, pricing and scheduling engines, and other technology and IP necessary to create a one-stop, online digital platform that could provide real-time pricing, booking, routing, scheduling, and tracking with a user-friendly customer interface.  The challenge was to market and sell the Vanguard platform not only to Vanguard's existing customers and network but to leverage the new technology to develop broader and deeper business around the globe, including both LCL and full-container-load ("FCL") shipping; both ocean-freight and airfreight; and full door-to-door shipping solutions and related services.

26.    Among the world's largest wholly owned and controlled end-to-end LCL networks, Vanguard already had a wealth of knowledge and expertise, a deep understanding of the entire value chain, and a massive amount of data regarding operations, schedules, pricing, customers, vendors, warehouses, and other aspects of the business.  The Mansours and Vanguard realized that Vanguard's expertise, knowledge, and data would be critical to the creation and operation of a reliable pricing engine with the options and information that sophisticated logistics and shipping customers would demand.  Vanguard's data was the indispensable content for the types of pricing, routing, and scheduling solutions and analytics engines that would need to be incorporated into its evolving one-stop, online digital platform.  Vanguard's knowledge, expertise, and experience were equally indispensable to running and updating such a platform, fine-tuning the big-data analytics, testing the accuracy of the algorithms, and providing the types of services and experience that Vanguard's customers would expect from a Mansour-owned enterprise.  The Mansours also had the necessary capital to invest in Vanguard's transformation and support its capital-intensive business model.

27.   To help Vanguard accomplish its ambitious objectives, the Mansour family and the OTS/Vanguard board worked to develop a strategic plan and formed a steering committee for the digital business.  In accordance with the plan, Vanguard and its owners found the right technology experts to create ADESSO and also created JiffyShip to help scale and carry out Vanguard's digital strategy and objectives in both LCL and FCL shipping and related services, from door to door, on a more global scale.

28.   JiffyShip began looking for ways to enhance ADESSO and helped Vanguard gather the necessary information and develop the necessary technology solutions, IP, and trade secrets to expand the breadth and depth of the digital business.  By early 2018, between ADESSO and the technology that JiffyShip was producing for Vanguard and its owners, Vanguard's technology solutions, IP, trade secrets, and other proprietary information included but were not limited to (1) big data on pricing, schedules, pickup and delivery locations, ocean shipping options, ports, inland transportation options, hubs, routes, warehouses, and other variables; (2) pricing logic and algorithms; (3) route logic and algorithms; (4) customer lists and customer data; (5) vendor lists and vendor data; (6) marketing logic and strategies; (7) product services and research and development; (8) market analyses; (9) prototypes, models, and plans; (10) financial information; and (11) any or all of the above produced by JiffyShip for, or in cooperation with, Vanguard and its owners (collectively, "Confidential Information").

### **Vanguard's Steps to Protect Its Confidential Information**

29.   Given the value of the Confidential Information, Vanguard and its owners took (and continue to take) significant steps to protect it and prevent its unauthorized use or disclosure.  For example, during Robinson's involvement with the Company, Vanguard strictly limited access to such Confidential Information, providing it only on a need-to-know basis to trusted persons who

-14-

are obligated not to misuse or disclose it; restricted and monitored access to physical facilities and maintained Confidential Information within such facilities; maintained secure, password-protected and encrypted networks and IT infrastructure; and made efforts to mark, segregate, and safely file, store, and transmit Confidential Information.  Moreover, Vanguard and its owners regularly indicated when Confidential Information was being disclosed in confidence and routinely had directors, officers, executives, employees, consultants, advisors, and other persons make oral and written promises and commitments—including by signing NDAs and other agreements—obligating them to maintain the secrecy and confidentiality of such Confidential Information, use it only for official Company business, and not disclose or discuss it with any unauthorized parties or use it for any unauthorized purpose.

30.    Robinson agreed orally and in writing to protect the Company's Confidential Information and to use it only in particular ways for particular purposes.  For example, Robinson signed a non-disclosure agreement (NDA) in which he agreed to protect Confidential Information and comply with other key terms and conditions, including among others a non-compete clause.  The NDA, attached together with its transmittal email as Exhibit 1, states in part that:

"In return for the Discloser making Confidential Information available to the Recipient, the Recipient undertakes to the Discloser that it shall (a) keep the Confidential Information secret and confidential; (b) not use or exploit, nor encourage or assist any other person to use or exploit, Confidential Information in any way (including, for the avoidance of doubt, directly or indirectly, contacting, negotiating, or entering into any transaction (whether investment of capital or otherwise)) with any third party to which any Confidential Information relates without the express consent of the Discloser except for the evaluation, negotiation and execution of the Purpose; (c) not compete with the Discloser in the creation of a Digital

-15-

solution for the sea freight and container logistics industry; (d) not directly or indirectly disclose or make available any Confidential Information in whole or in part to any person; and (e) not copy, reduce to writing or otherwise record the Confidential Information except as strictly necessary for the Purpose.  Any such copies, reductions to writing and records shall be the property of the Discloser. (f) the Recipient expressly undertakes not to contact directly or indirectly any contacts, persons and/or organisations introduced to the Recipient by the Discloser whether for any other reason than purposes of helping VLS and its shareholders with its strategy; (g) Nothing in this agreement shall be deemed to create a partnership between the parties, or to grant or convey any license (express or implied) under, or right to, any intellectual property comprised in Confidential Information. (h) Recipient shall destroy or return within ten business days all Confidential Information (written, electronic and visual) upon the Discloser's request."

### Fraser Robinson's Roles, Duties, and Unlawful Scheme

31.   In late 2017, Robinson reached out to one of Vanguard's owners—Mohamed Mansour ("Mr. Mansour")—to see if the Mansour family had any openings he could fill at Vanguard.  Mr. Mansour explained to Robinson that Vanguard was on the verge of a significant technological transformation and would be looking to leverage its new technology to expand the scope of its global business.  Robinson touted how he sold and marketed a transformational digital platform for Uber, in an effort to explain how he could be helpful to Vanguard.  Robinson claimed to know nothing about the logistics and shipping services business, but insisted he could learn the business quickly and help shape, market, and sell Vanguard's digital business the same way he had helped market and sell Uber's revolutionary digital platform to disrupt the global ride-hailing industry.  Robinson said he would need unfettered access to Confidential

COMPLAINT

Information in order to perform his duties as consultant, advisor, director, internal committee member, and fiduciary to the Company during its digital transformation.  Vanguard and the Mansour companies shared Confidential Information with Robinson because he promised orally and in writing that he would protect such information and use it solely for the performance of his roles and duties as a consultant, advisor, director on the board, Digital Steering Committee member, and fiduciary for OTS/Vanguard.  Robinson agreed orally and in writing to serve the best interests of the Company, to protect Confidential Information from disclosure or misuse, not to compete with the Company in digital logistics and shipping, and to use Confidential Information solely for the purpose of advising and helping the Company implement and pursue its digital strategy.  Robinson agreed orally and in writing that his work for the Mansours and the Mansour businesses that included JiffyShip, OTS, and other affiliates, was related to, and for the benefit of, Vanguard.  Based upon Robinson's oral and written promises, he was hired as a consultant and advisor, appointed to the board of directors, and made a member of the Company's Digital Steering Committee.

32.   It was clear to all that the information Robinson was receiving in connection with his work relating to Vanguard and its digital business was Confidential Information subject to protection under the NDA, consulting agreement, and common law and statutory obligations arising from his work as a consultant, advisor, board director, and committee member.  Communications between Robinson and the Mansour family made very clear the requirements that Robinson would be working for the benefit of Vanguard and its owners, serving on the board, sitting on the board, providing consulting and fiduciary services to Vanguard and its owners, and helping Vanguard and its owners further refine, develop, implement, market, and sell the digital platform and the digital business for Vanguard and its owners.

COMPLAINT

33.    In or around December 2017, Robinson began serving on the board, serving with the Digital Steering Committee, and performing duties as a consultant and advisor, all for the purpose of guiding the development and direction of Vanguard's new online platform and digital strategy.

34.    Starting in or around December 2017 and continuing through most of 2018, Robinson had access to extensive amounts of Confidential Information, including sensitive business plans, customer and vendor data, pricing data, prototypes of the online platform being developed, prototypes of the analytics engines being developed, and other IP, trade secrets, and proprietary business information that Vanguard and its owners had acquired, developed, and refined over many years.  Starting in or around December 2017, Robinson attended board meetings, Digital Steering Committee meetings, and other internal meetings in which extensive amounts of Confidential Information was disclosed and discussed.  Robinson met and communicated with senior officials at the Company, including officers and directors, who shared vast amounts of Confidential Information with Robinson.

35.    Vanguard's Chief Strategy Officer, Graham Cousins, gave Robinson access to business plans and strategies, customer and vendor data, pricing and shipping data, and other Confidential Information, with the understanding that Robinson would use it to perform his duties as an advisor, consultant, director, and committee member.  Graham shared vast amounts of sensitive and proprietary Confidential Information with Robinson.  He spent hours explaining to Robinson how Vanguard's business worked, why other established companies and startups had failed in their efforts to pursue a digital strategy in the logistics and shipping industries, and how Vanguard's strategy and technology would allow it to overcome the obstacles that had caused other companies to fail.  He met and communicated with Robinson to explain Vanguard's existing digital business and technology, pricing practices, industry analysis, competitive

advantages, and business strategies.  He introduced Robinson to members of Vanguard's network of brokers and counsel, shared customer and supplier lists, and provided regular tutorials to make sure that Robinson understood every detail of Vanguard's operations, business, and technology.  He provided this information because he knew that Robinson had made oral and written promises to protect this information and to use it solely to perform his duties to the Company and its owners.

36.    At the instruction of the Mansour family and Vanguard, the technology team at JiffyShip also shared with Robinson vast amounts of Confidential Information developed for the digital business.  It shared Confidential Information that JiffyShip had developed for Vanguard and its owners, including but not limited to technology prototypes, plans for the platform, pricing data and logic, shipping data and logic, analytics engines, algorithms, research and development data, financial data, and other IP and trade secrets.  Vanguard, Vanguard's affiliates, and Vanguard's owners shared with Robinson this Confidential Information about Vanguard and the technology that was being developed for Vanguard, for the sole and express purpose of facilitating Robinson's performance of his duties as a consultant, advisor, board director, and committee member in the best interests of the Company and its owners.

37.    Vanguard and its owners and affiliates gave Robinson open access to the Company, its personnel, its Confidential Information, and its other assets, only because he had promised to protect it and use it only to serve their best interests.  Based on these and other promises, Vanguard's owners even gave Robinson office space where he could to his work for Vanguard.

38.    Vanguard and its owners paid for Robinson to travel to the Vanguard headquarters in Long Beach, California, and to the location of technology experts at JiffyShip's office in India.  While in Long Beach, California,

Robinson met with Vanguard's executives, senior management, and members of
its network.  Also while in Long Beach, California, Robinson continued
gathering and copying Confidential Information.  While in India, Robinson met
with the leaders of Vanguard's technology team at JiffyShip, and obtained more
large amounts of Confidential Information, including but not limited to product
demos and prototypes, research and development data, sales and pricing data,
analytics engines, and other IP, trade secrets, and proprietary information.

39.    During the entire time that Robinson performed his work, he had
contractual, statutory, and common law duties to the Company under his
consulting agreement, NDA, and non-compete agreement, and also pursuant to
his positions as a member of the board of directors and Digital Steering
Committee.  On or around July 26, 2018, Loutfy Mansour sent Robinson a
revised consulting agreement, to which Robinson agreed on July 28, 2018.  It
states among other things that "[t]he Consultant has signed a Confidentiality
Agreement with the Client dated December 4, 2017 which is still in effect
(attached hereto)," "[a]ll confidentiality clauses and previous Confidentiality
Agreement, unless superseded by new agreements, to remain in full effect in the
event of termination for a period of 2 years following the termination date,"
"[e]very person with whom the Consultant shares any Confidential Information
will sign a separate confidentiality agreement with regards to all Confidential
Information shared, written or oral,"

"[n]either the Consultant or any person with whom the Consultant shares
Confidential Information (such person, people or group to sign a separate
confidentiality and non-competition agreement), will not compete directly
or indirectly with the Client or any of its businesses about which it has
shared Confidential Information including the creation of a Digital strategy,
solution, company or structure that, as per the Confidentiality Agreement
signed between the parties on December 4, 2017, deals with the sea freight

and container logistics industry,"

and "Clauses 17 to 22 relating to Confidential Information, Non-Competition and Ownership of Inetellectual (sic) Property to survive and last for 2 years following the date of termination of this Agreement."  This consulting agreement is attached as Exhibit 2.  Robinson agreed in writing to the revised consulting agreement on July 28, 2018.

40.   On or around September 25, 2018, Robinson subsequently asked to renegotiate the confidentiality and non-compete terms of his contracts.  He said his lawyer advised him to shorten the duration of his confidentiality and non-compete obligations from two years and two years, respectively, down to one year and six months, respectively.  The Mansours did not agree to Robinson's request.

41.   At the same time, *i.e.*, on or around September 25, 2018, Robinson sought to reposition himself as a C-level candidate, and co-founder, and co-owner of the business and also asked for equity in the Company or some part of the digital business, notwithstanding that he was hired as a consultant, advisor, board director, and committee member, with contractual, statutory, and common law duties to the Company and its owners.  Having apparently begun to understand the potential value of Vanguard's digital business—and the possibility of expanding the ADESSO platform to encompass a broader set of logistics and shipping services on a global scale—Robinson tried to change his role status from that of advisor, consultant, and director, to that of co-founder and co-owner.  Rather than collect the hourly and annual rates to which he had agreed, Robinson asked for equity in the digital business.  Meanwhile, on information and belief, he and Izmailov continued gathering and copying from Vanguard and using the information for the benefit of Beacon.

42.   The Mansours did not believe that Robinson had earned the ownership stake or co-founder role he wanted, in part because Robinson had not

invested any capital, was not an owner, and had not otherwise contributed anything substantial enough to warrant an equity share of the business. The Mansours were willing nonetheless to consider, and even tried to negotiate, an arrangement under which Robinson and Izmailov could have earned equity in the Company by helping to market, sell, and expand Vanguard's digital business.

43.     Unbeknownst to the Mansours and Vanguard, however, on information and belief Robinson had been simultaneously stealing from Vanguard and its technology developers at JiffyShip, while working double-time to prop up Beacon, where it seems he used what he had stolen. While concealing this duplicitous and unlawful scheme, Robinson continued the purported "negotiations" over the terms of his engagement with Vanguard, making baseless and unrealistic claims to support demands for percentages of equity in Vanguard's digital business. In doing so, he delayed implementation of the Company's digital business plan and gained more time to continue stealing Confidential Information he could use to set up Beacon.

44.     In his drawn-out "negotiations" over equity, Robinson took the position that Vanguard and its owners should think of him as a "co-founder" of Vanguard's new digital business. But this was untrue and absurd. Vanguard and its owners were the founders of Vanguard's digital business, which had been conceived and launched prior to Robinson's arrival, without Robinson contributing anything. And Robinson's roles—which did not include owning or co-founding—had been established in oral and written communications and contracts. His relevant expertise and potential contributions were in business development and marketing. Robinson had agreed to be a consultant, advisor, board member, and committee member, not an owner or co-founder. He was obligated to perform his roles in accordance with his contractual, statutory, and common law duties, in the interests of the companies he served, not in his own interest or Beacon's interest. Although it conflicted with his existing duties to

-22-

the Company, Robinson continued trying to negotiate with the Mansours for equity, even as he—upon information and belief—carried out his unlawful scheme to copy and take from Vanguard and its technology company JiffyShip in order to start Beacon.

**Robinson's Unlawful Scheme Is Revealed:  Robinson Misappropriates Vanguard's Confidential Information to Create Beacon**

45.   On information and belief, Robinson incorporated Beacon

COMPLAINT

Technologies Ltd. on November 7, 2018,[2] while he still owed contractual, statutory, and common law duties to Vanguard; and while he still had duties to act in the best interests of Vanguard.

46.   On information and belief, Robinson created Beacon—a copycat company and competitor of Vanguard—while he still owed contractual, statutory, and common law duties to Vanguard and its owners and while his consulting agreement, NDA, non-compete agreements, board directorship, and committee membership with the Company were ongoing and still in effect.  On information and belief, Robinson and his agent, Izmailov, used Beacon servers, emails, and/or accounts to access and steal more Confidential Information from Vanguard and its affiliates.  Upon information and belief, in order to continue his unlawful scheme in secret, Robinson concealed from Vanguard and its owners that he had incorporated Beacon and that he was using Beacon servers, emails, and/or accounts to gain access to and steal Confidential Information belonging to Vanguard and its affiliates.

47.   Notably, when Beacon was incorporated on or around November 7, 2018, little more than a month had passed since Robinson had tried to change the terms of his engagement with Vanguard, in an effort to obtain equity in Vanguard's digital business.  As he prepared to incorporate and launch Beacon, Robinson concealed his efforts from Vanguard and the Mansours.  At the same time, he was working for Vanguard, while trying to renegotiate the terms of his compensation to include an unrealistic percentage of equity or ownership in the digital business.  During this time, his contracts with, roles in, and fiduciary duties to Vanguard and its owners were still in effect; he was still a consultant, advisor, board director, and steering committee member; and he still had obligations to perform his duties for, and in the best interests of, Vanguard and

---

[2] Beacon's website touts that "Beacon launched in 2018 with a mission to become a global leader in logistics and trade finance by making trader simpler, more transparent and reliable." https://beacon.com/company/about

COMPLAINT

1    its owners.  During the period he was working to plan, create, establish, and

2    develop Beacon, Robinson still had contractual, statutory, and common law

3    duties to Vanguard and its owners.  On information and belief, Robinson was

4    thus engaged in fraud, self-dealing, and other unfair and deceptive business

5    practices, and otherwise violating his obligations to Vanguard and its owners.

6         48.    On information and belief, Robinson created Beacon using

7    Confidential Information he stole from Vanguard.  On information and belief, he

8    copied, stole, misappropriated, converted, and otherwise used for Beacon's

9    benefit Vanguard's digital business plan, as well as its online platforms, digital

10   business concepts, prototypes of then-secret digital technology to enhance and

11   expand the existing business and platforms, and vast amounts of Confidential

12   Information comprised of, among other things, pricing data and models,

13   customer and supplier lists, prototypes of the customer interface, and other IP,

14   trade secrets, and proprietary information.  On information and belief,

15   Defendants have used Vanguard's digital business plan and Confidential

16   Information to establish and operate Beacon.

17        49.    Defendants have harmed Vanguard by misappropriating, disclosing,

18   and using its proprietary business plans and strategies, trade secrets, IP, and other

19   Confidential Information against the Company's interests, in ways that have

20   harmed the Company and its digital business, along with its owners, officers, and

21   directors; reduced the Company's competitive advantage in the marketplace;

22   reduced its market share; and harmed its reputation.

23        50.    Defendants further harmed Vanguard by causing it to alter and delay

24   its digital transformation and expansion.  Rather than continue racing to

25   implement its digital strategy and enhance, market, and sell its proprietary digital

26   technology and platform to the global market, Vanguard lost critical time

27   teaching Robinson the industry; disclosing and explaining the Company's

28   complex business, data, technology, and other Confidential Information to him;

COMPLAINT

and delaying or reconsidering the further development and deployment of the plan in response to harmful and self-serving input from Robinson.  Instead of focusing on moving forward with the digital business plan and prototypes throughout 2018, Vanguard had paused to teach Robinson what he said he needed to know to help the Company and then followed his self-serving advice to reconsider, delay, and alter its plans.  The expectation was that he would use whatever Confidential Information was shared with him to perform his contractual, statutory, and common law duties to the Company, as part of a groundbreaking effort to propel Vanguard forward and ahead of the competition.  Instead, Robinson betrayed the Company and its owners, breached his duties and obligations, and misappropriated the Company's Confidential Information and other assets to create and operate Beacon as a copycat company and competitor.  At the same time, Robinson caused further distraction and delay by asking for, and purporting to "negotiate," an equity percentage in Vanguard's digital business.  On information and belief, the unrealistic, self-serving, unjustified requests for equity were based on misrepresentations and false pretenses intended to disguise his unlawful scheme, to enable him to continue secretly stealing Confidential Information from Vanguard and its affiliates up to and even beyond the moment he began to create his copycat company, Beacon.  In violation of his duties to Vanguard, Robinson never proposed a clear go-to-market strategy nor performed his other duties to the Company.  Instead, he stalled Vanguard's progress without giving any clear input or direction, while he used the extra time to learn the business, steal whatever he could from Vanguard, and create his own Company.

51.    As a result of Robinson's unlawful conduct, Vanguard's digital transformation occurred later and differently than it otherwise would have.  And as a further result of Defendant's unlawful conduct, Beacon was established, became a competitor, and began to take valuable market share, which never

COMPLAINT

would have happened without Robinson's scheme to fraudulently acquire and unlawfully use Vanguard's business model, ideas, and Confidential Information.

52.     Vanguard was further damaged by Beacon's entrance into the market, in part because Beacon entered the marketplace using Vanguard's Confidential Information and digital concept and platform, while finding investors in California and attempting to take executives, customers, suppliers, subcontractors, and market share away from Vanguard.  Vanguard's partners can now become competitors by partnering with Beacon and benefiting from a business model, digital platform, technology, and other Confidential Information that Beacon stole from Vanguard.

**COUNT I**

**Intentional Misrepresentation and Fraud**

**(Against Robinson)**

53.     Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

54.     As detailed above, Robinson represented to Vanguard and its owners and affiliates that he intended to pursue a business relationship with Vanguard and that he would work as a consultant, advisor, board director, and member of the Digital Steering Committee for the benefit, and in the best interests, of Vanguard and its owners, to help develop and implement the digital transformation of Vanguard's business.  On information and belief, those representations were knowingly false, and Robinson intended to deceive Vanguard.

55.     On information and belief, Robinson's real intentions were to work with Vanguard so that he could learn from, exploit, and steal Vanguard's Confidential Information, business plans, and operational know-how, amassed over decades through Vanguard's hard work, initiative, innovation, and experience.  On information and belief, Robinson lied to and stole from

Vanguard, as part of an unlawful and fraudulent conspiracy and scheme to use Vanguard's Confidential Information and other stolen property to create and run Beacon.  Robinson wanted to, and did, use his relationship with Vanguard to copy its digital business plan and create a competing business in the same digital space and sector.  Had Vanguard and its owners known Robinson's true intentions, neither Vanguard nor its owners ever would have agreed to work with Robinson.

56.   On information and belief, Robinson intended Vanguard and its owners and affiliates to rely on his representations, and in turn provide Robinson with access to Confidential Information, personnel, data, property, clients, vendors, and other contacts so that Robinson could then use such information and property to develop his own company quickly.  On information and belief, the real reason that Robinson wanted to have a working relationship with Vanguard was for access to secret and proprietary information, clients, suppliers, and contacts so that he could then use such information to develop his own company quickly.  On information and belief, when Robinson promised to pursue a genuine business relationship in good faith or work with and for the benefit of Vanguard and its owners, he was misrepresenting his true intentions in order to gain access to Confidential Information he used to start his own business.

57.   Vanguard and its owners, not knowing that Robinson was misrepresenting his intentions, reasonably relied on Robinson's misrepresentations.

58.   Robinson's misrepresentations—and Vanguard's and its owners' reasonable reliance on those misrepresentations—harmed Vanguard.  Robinson's misrepresentations allowed Robinson to gain access to a wealth of Confidential Information and related knowledge, and, upon information and belief, allowed Robinson to quickly develop a competing business called Beacon, which in turn

COMPLAINT

1    stole Vanguard's market share, clients, potential clients, and potential

2    employees, causing Vanguard to suffer money damages.

3        59.   Vanguard's reasonable reliance on Robinson's misrepresentations

4    was a substantial factor in causing Vanguard's harm.

5        60.   Vanguard suffered damages as a direct result of Robinson's

6    fraudulent conduct in an amount to be proven at trial.

7        61.   Vanguard seeks punitive damages against Robinson for his willful,

8    wanton, and malicious fraudulent conduct.

9

10                              **<u>COUNT II</u>**

11   **Misappropriation of Trade Secrets Under the Defend Trade Secrets Act**

12                   **18 U.S.C. § 1836, *et seq.***

13                   **(Against Both Defendants)**

14       62.   Vanguard re-alleges and incorporates by reference the allegations of

15   the preceding paragraphs of this Complaint, as if fully set forth herein.

16       63.   The information Defendants misappropriated constitutes protectable

17   trade secrets owned by Vanguard, as set forth in 18 U.S.C. § 1839(3).  Based on

18   an examination of Beacon's public materials, and on information and belief,

19   Defendants have misappropriated at least the following IP, trade secrets, and

20   proprietary information, including but not limited to (1) big data on pricing,

21   schedules, pickup and delivery locations, ocean shipping options, ports, inland

22   transportation options, hubs, routes, warehouses, and other variables; (2) pricing

23   logic and algorithms; (3) route logic and algorithms; (4) customer lists and

24   customer data; (5) supplier lists and supplier data; (6) marketing logic and

25   strategies; (7) product services and research and development; (8) market

26   analyses; (9) prototypes, models, and plans; (10) financial information; and (11)

27

28

COMPLAINT

1  any or all of the above produced by JiffyShip for, or in cooperation with,

2  Vanguard and its owners (collectively, "Confidential Information").

3      64.   On information and belief, the Defendants' theft of Vanguard's

4  Confidential Information goes well beyond the specific examples of trade secrets

5  identified here, as will be demonstrated after Vanguard receives discovery in this

6  litigation.

7      65.   Vanguard's Confidential Information is economically valuable to

8  Vanguard.  Vanguard's Confidential Information derives independent economic

9  value from not being generally known to the public or to other persons who can

10  obtain economic value from its disclosure or use.

11      66.   Vanguard has developed at substantial expense, and continues to

12  maintain, its Confidential Information.

13      67.   Vanguard took, and continues to take, reasonable and adequate

14  measures to protect its Confidential Information from unauthorized use and

15  disclosure.  For example, during Robinson's involvement with the Company,

16  Vanguard strictly limited access to such Confidential Information, providing it

17  only on a need-to-know basis to trusted persons who are obligated not to misuse

18  or disclose it; restricted and monitored access to physical facilities and

19  maintained Confidential Information within such facilities; maintained secure,

20  password-protected and encrypted networks and IT infrastructure; and made

21  efforts to mark, segregate, and safely file, store, and transmit Confidential

22  Information.  Moreover, Vanguard and its owners regularly indicated when

23  Confidential Information was being disclosed in confidence and routinely had

24  directors, executives, employees, consultants, and other persons make oral and

25  written promises commitments—including by signing NDAs and other

26  agreements—obligating them to maintain the secrecy and confidentiality of such

27  Confidential Information, use it only for official Company business, and not

28  disclose or discuss it with any unauthorized parties or use it for any unauthorized

1  purposes.

2      68.  Vanguard does not and did not consent to the use of any of its trade

3  secrets by anyone other than authorized individuals using them within the scope

4  of their duties for Vanguard.

5      69.  In or around December 2017, Robinson began working as a director

6  on the board, internal committee member, consultant, and advisor and assumed

7  fiduciary and contractual obligations to act in the best interests of Vanguard and

8  maintain the confidentiality of everything he obtained and learned from it, its

9  owners, its network, and its personnel.  Through this work, and pursuant to a

10  consulting agreement, NDA, non-compete agreements, committee role, and

11  fiduciary role, Robinson obtained access to Confidential Information and shared

12  such access with Izmailov.  At all times, Robinson knew that Vanguard expected

13  and obligated him to maintain the confidentiality of Vanguard's propriety

14  information and Confidential Information and to not disclose the information to

15  third parties.

16      70.  Vanguard's Confidential Information relates to products and/or

17  services used, sold, and ordered in, or intended to be used, sold, and/or ordered

18  in, interstate and foreign commerce.

19      71.  Defendants have shared and/or used Vanguard's Confidential

20  Information for their own benefit and directly in connection with Beacon.

21  Beacon is the means through which Robinson is using and attempting to

22  monetize Vanguard's business model, ideas, and Confidential Information.

23      72.  Robinson was aware that he was under a duty not to disclose or use

24  Vanguard's Confidential Information.

25      73.  Defendants engaged in acts in furtherance of their misappropriation

26  in the United States.  Robinson, while working as a consultant, advisor, board

27  director, and committee member with contractual, statutory, and common law

28  duties to Vanguard, traveled to Long Beach, California.  While in Long Beach,

-31-

Robinson met with executives, senior management, customers, vendors, and other of Vanguard's industry contacts. While in Long Beach, California, and thereafter—over emails, telephone calls, and other communications—Robinson obtained from Vanguard executives, personnel, and contacts in California large amounts of additional Confidential Information, including customer and vendor data, sales and pricing data, business processes data, and other IP, trade secrets, and proprietary information.

74. On information and belief, at the time Robinson acquired Vanguard's Confidential Information (including while in Long Beach and thereafter), Robinson knew he was going to use Vanguard's Confidential Information for his own benefit in violation of his duty not to disclose or use Vanguard's Confidential Information.

75. Robinson, primarily through Beacon, has used and continued to use Vanguard's Confidential Information knowing that such Confidential Information was obtained and misappropriated through deceitful and improper means. Such misappropriation allowed Defendants to develop competing products and/or services, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without the misappropriation of Vanguard's Confidential Information.

76. Defendants' misappropriation of Vanguard's Confidential Information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

77. If Defendants' conduct is not enjoined, they will continue to misappropriate, disclose, and use Vanguard's Confidential Information for their own benefit and to Vanguard's detriment, and may disseminate Confidential Information to potential investors or other third parties.

78. As the direct and proximate result of Defendants' conduct, Vanguard has suffered and, if Defendants' conduct is not stopped, will continue to suffer,

irreparable injury, including loss of business opportunities, lost profits, injury to the value of its service and goodwill, injury to its product identity, and loss of control over its goodwill and reputation, and a decreased ability to move into new markets.  As a direct and proximate result of Defendants' misappropriation, Vanguard has suffered and continues to suffer significant damages in an amount to be proven at trial.  As a further direct and proximate result of Defendants' misappropriation, Defendants have been unjustly enriched in an amount to be proven at trial.

79.   Because Vanguard's remedy at law is inadequate, Vanguard seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its Confidential Information and other legitimate business interests.  Moreover, Defendants' intentional, willful, and malicious conduct indicates that injunctive or other equitable relief will be inadequate to prevent Defendants' future misconduct.  Therefore, Vanguard further seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of Vanguard's Confidential Information and confidential or proprietary information in the possession, custody, or control of any Defendant in order to recover and protect Vanguard's Confidential Information and other legitimate business interests.  Vanguard has been damaged by all of the foregoing.  Vanguard is entitled to an award of exemplary damages and attorneys' fees.

## COUNT III

**Misappropriation of Trade Secrets Under the California Uniform Trade Secret Act**

**Cal. Civ. Code §§ 3426 *et seq*.**

**(Against Both Defendants)**

80.   Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

81.   The information Defendants misappropriated constitutes protectable

-33-

trade secrets owned by Vanguard, as set forth in Cal. Civ. Code § 3426.1(d). Based on an examination of Beacon's public materials, and on information and belief, Defendants have misappropriated at least the following IP, trade secrets, and proprietary information, including but not limited to (1) big data on pricing, schedules, pickup and delivery locations, ocean shipping options, ports, inland transportation options, hubs, routes, warehouses, and other variables; (2) pricing logic and algorithms; (3) route logic and algorithms; (4) customer lists and customer data; (5) vendor lists and vendor data; (6) marketing logic and strategies; (7) product services and research and development; (8) market analyses; (9) prototypes, models, and plans; (10) financial information; and (11) any or all of the above produced by JiffyShip for, or in cooperation with, Vanguard and its owners (collectively, "Confidential Information").

82.    On information and belief, Defendants' theft of Vanguard's Confidential Information goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after Vanguard receives discovery in this litigation.

83.    Vanguard's Confidential Information is economically valuable to Vanguard.  Vanguard's Confidential Information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use as set forth in Cal. Civ. Code § 3426.1(d)(1).

84.    Vanguard has developed at substantial expense, and continues to maintain, its Confidential Information.

85.    Vanguard took, and continues to take, reasonable and adequate measures to protect its Confidential Information from unauthorized use and disclosure.  For example, during Robinson's involvement with the Company, Vanguard strictly limited access to such Confidential Information, providing it only on a need to know basis to trusted persons who are obligated not to misuse

-34-

or disclose it; restricted and monitored access to physical facilities and maintained Confidential Information within such facilities; maintained secure, password-protected and encrypted networks and IT infrastructure; and made efforts to mark, segregate, and safely file, store, and transmit Confidential Information.  Moreover, Vanguard and its owners regularly indicated when Confidential Information was being disclosed in confidence and routinely had directors, executives, employees, consultants, and other persons make oral and written promises commitments—including by signing NDAs and other agreements—obligating them to maintain the secrecy and confidentiality of such Confidential Information, use it only for official Company business, and not disclose or discuss it with any unauthorized parties or use it for any unauthorized purpose.

86.   Vanguard does not and did not consent to the use of any of its trade secrets by anyone other than authorized individuals using them within the scope of their duties for Vanguard.

87.   In or around December 2017, Robinson began working as a director on the board, internal committee member, consultant, and advisor and assumed fiduciary and contractual obligations to act in the best interests of Vanguard and maintain the confidentiality of everything he obtained and learned from it, its owners, its network, and its personnel.  Through this work, and pursuant to a consulting agreement, NDA, non-compete agreement, and fiduciary role, Robinson obtained access to Vanguard's Confidential Information.  At all times, Robinson knew that Vanguard expected and obligated him to maintain the confidentiality of Vanguard's propriety information and Confidential Information and to not disclose the information to third parties.

88.   Defendants have shared and/or used Vanguard's Confidential Information for their own benefit and directly in connection with Beacon.

COMPLAINT

Beacon is the means through which Defendants are using and attempting to monetize Vanguard's business model, ideas, and Confidential Information.

89.    Robinson was aware that he was under a duty not to disclose or use Vanguard's Confidential Information.

90.    Defendants' misappropriation of Vanguard's Confidential Information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

91.    If Defendants' conduct is not enjoined, they will continue to misappropriate, disclose, and use Vanguard's Confidential Information for their own benefit and to Vanguard's detriment, and may disseminate Confidential Information to potential investors or other third parties.

92.    As the direct and proximate result of Defendants' conduct, Vanguard has suffered and, if Defendants' conduct is not stopped, will continue to suffer, irreparable injury, including loss of business opportunities, lost profits, injury to the value of its service and goodwill, injury to its product identity, and loss of control over its goodwill and reputation, and a decreased ability to move into new markets.  As a direct and proximate result of Defendants' misappropriation, Vanguard has suffered and continues to suffer significant damages in an amount to be proven at trial.  As a further direct and proximate result of Defendants' misappropriation, Defendants have been unjustly enriched in an amount to be proven at trial.

93.    Because Vanguard's remedy at law is inadequate, Vanguard seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its Confidential Information and other legitimate business interests. Moreover, Defendants' intentional, willful, and malicious conduct indicates that

COMPLAINT

injunctive or other equitable relief will be inadequate to prevent Defendants'
future misconduct.

94.    Vanguard has been damaged by all of the foregoing.  Vanguard is
entitled to an award of exemplary damages and attorneys' fees.

95.    Defendants' conduct as described above was willful and malicious
and done with the deliberate intent to injure Vanguard and benefit themselves,
thereby depriving Vanguard of property rights and causing injury.  Such actions
were fraudulent, malicious, oppressive and constituted despicable conduct in
conscious disregard of Vanguard's rights, and by reason thereof, Vanguard is
entitled to reasonable attorneys' fees and costs, and punitive damages under
California Civil Code § 3426.  Unless restrained and enjoined, Defendants will
continue to threaten to misappropriate or actually misappropriate all or part of
Vanguard's Confidential Information, causing irreparable harm to Vanguard.

## COUNT IV

### Breach of Contract (Consulting Agreement)

### (Against Defendant Robinson)

96.    Vanguard re-alleges and incorporates by reference the allegations of
the preceding paragraphs of this Complaint, as if fully set forth herein.

97.    Robinson entered into a contract with a Mansour entity known as
Man Capital or ManCap, to perform obligations for Vanguard/OTS.

98.    The contract bestowed upon Robinson fiduciary duties and provided
that Robinson was to join the board and advise on the expansion and marketing
of Vanguard's digital strategy and

> "work with the ManCap, Vanguard and JiffyShip teams on development of
> the new digital freight forwarder/NVOCC business, including collaborating
> on business model, plan, hiring, budgeting and overall strategy."

The contract further contained a broad confidentiality provision stating among
other things that "[t]he Consultant has signed a Confidentiality Agreement with

the Client dated December 4, 2017 which is still in effect (attached hereto)," "[a]ll confidentiality clauses and previous Confidentiality Agreement, unless superseded by new agreements, to remain in full effect in the event of termination for a period of 2 years following the termination date," "[e]very person with whom the Consultant shares any Confidential Information will sign a separate confidentiality agreement with regards to all Confidential Information shared, written or oral,"

"[n]either the Consultant or any person with whom the Consultant shares Confidential Information (such person, people or group to sign a separate confidentiality and non-competition agreement), will not compete directly or indirectly with the Client or any of its businesses about which it has shared Confidential Information including the creation of a Digital strategy, solution, company or structure that, as per the Confidentiality Agreement signed between the parties on December 4, 2017, deals with the sea freight and container logistics industry,"

and "Clauses 17 to 22 relating to Confidential Information, Non-Competition and Ownership of Inetellectual (sic) Property to survive and last for 2 years following the date of termination of this Agreement."

99.    Vanguard had no obligations to fulfill under the contract to receive the benefits intended for Vanguard.

100.   Vanguard was the intended and direct beneficiary of the contract between Man Capital and Robinson.  Moreover, a motivating purpose for the contract was to benefit Vanguard; Robinson was to advise Vanguard's further development and marketing of its digital strategy and

"work with the ManCap, Vanguard and JiffyShip teams on development of the new digital freight forwarder/NVOCC business, including collaborating on business model, plan, hiring, budgeting and overall strategy."

-38-

COMPLAINT

101.  Although the contract was not signed by the parties, the parties each represented that they would abide by the terms of the contract as discussed, both prior to exchanging drafts and after exchanging drafts.  All the essential terms, as alleged herein, were included in writing and the contract was an effective written contract.  The parties to the contract also affirmed the essential terms of the Consulting Agreement and their mutual assent to these terms orally, contemporaneously with the exchange of essential written terms, and therefore the consulting agreement is enforceable as an oral contract.

102.  Robinson's actions demonstrate that he agreed to be bound under the contract.  As alleged throughout this complaint, and specifically in the above-incorporated paragraphs, Robinson's actions demonstrate his agreement to serve as a director on the board, consultant, advisor, and member of the Digital Steering Committee, to act in the best interests of Vanguard and help oversee, advise, and guide the development and direction of Vanguard's new online platform and digital strategy; that Robinson would have access to Confidential Information; and that Robinson was under an obligation to keep such information confidential.  Robinson's conduct manifested the existence of these terms and his agreement to these terms.  The Mansours, Vanguard/OTS, and ManCap demonstrated their agreement to be mutually bound by the contract. The Consulting Agreement is therefore also enforceable as an implied-in-fact contract.

103.  Robinson, through his actions and statements as set forth above, breached the terms, covenants, conditions, and agreements of the contract.

104. As a result of Robinson's breach, Vanguard has suffered and continues to suffer significant damages in an amount to be proven at trial.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant Robinson)

-39-

105.  Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

106.  Robinson entered into contracts with a Mansour entity known as Man Capital or ManCap, to perform obligations for Vanguard/OTS.  Robinson also agreed to serve on the board of directors and on an internal Digital Steering Committee for Vanguard/OTS

107.  These contracts imposed on Robinson contractual and fiduciary duties and provided that Robinson was to join the board and advise Vanguard's digital strategy and "work with the ManCap, Vanguard and JiffyShip teams on development of the new digital freight forwarder/NVOCC business, including collaborating on business model, plan, hiring, budgeting and overall strategy." The contract further contained a broad confidentiality provision stating among other things that "[t]he Consultant has signed a Confidentiality Agreement with the Client dated December 4, 2017 which is still in effect (attached hereto)," "[a]ll confidentiality clauses and previous Confidentiality Agreement, unless superseded by new agreements, to remain in full effect in the event of termination for a period of 2 years following the termination date," "[e]very person with whom the Consultant shares any Confidential Information will sign a separate confidentiality agreement with regards to all Confidential Information shared, written or oral," "[n]either the Consultant or any person with whom the Consultant shares Confidential Information (such person, people or group to sign a separate confidentiality and non-competition agreement), will not compete directly or indirectly with the Client or any of its businesses about which it has shared Confidential Information including the creation of a Digital strategy, solution, company or structure that, as per the Confidentiality Agreement signed between the parties on December 4, 2017, deals with the sea freight and container logistics industry," and "Clauses 17 to 22 relating to Confidential

COMPLAINT

Information, Non-Competition and Ownership of Inetellectual (sic) Property to survive and last for 2 years following the date of termination of this Agreement."

108.  Vanguard was the intended and direct beneficiary of the contract between Man Capital and Robinson.  Moreover, a motivating purpose for the contract was to benefit Vanguard (including with and through JiffyShip) at least because Robinson was to advise Vanguard's further development of its digital strategy and "work with the ManCap, Vanguard and JiffyShip teams on development of the new digital freight forwarder/NVOCC business, including collaborating on business model, plan, hiring, budgeting and overall strategy."

109.  Vanguard had no obligations to fulfill under the contract to receive the benefits intended for Vanguard.

110.  There were no conditions required for Robinson's performance, therefore all conditions required for Robinson's performance were fulfilled.

111.  Although the contract was not signed by Man Capital or Robinson, they each represented in writing, verbally, and through their actions that they would abide by the terms of the contract as discussed prior to exchanging drafts and after exchanging drafts.

112.  Robinson, through his actions and statements as set forth above, breached the terms, covenants, conditions, and agreements of the contract. Robinson breached the implied covenant of good faith and fair dealing found in the contract by misleading Man Capital and Vanguard about his performance. He denied Man Capital and Vanguard the benefits of his performance by falsely representing he was acting for the benefit of Vanguard when the truth was that he was acting to benefit Beacon, exclusive from Vanguard, and was actively violating the terms of his confidentiality obligations for the benefit of himself and Beacon.  Robinson has unfairly and intentionally interfered with Vanguard's right to receive its benefits under the contract, including the development of the new business as contemplated under the contract.  Robinson further breached his

duty of good faith and fair dealing by violating the agreement's confidentiality provisions and misappropriating Vanguard's trade secrets and confidential and proprietary information.

113.  Robinson's conduct as described above was willful and malicious and done with the deliberate intent to injure Vanguard and benefit himself.

114.  As a result of Robinson's breach, Vanguard has suffered and continues to suffer significant damages in an amount to be proven at trial.

## COUNT VI

### Breach of Contract (NDA/Non-Compete)

### (Against Defendant Robinson)

115.   Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

116.  A contract existed between Man Capital and Robinson, both written and oral and implied-in-fact.

117.  Vanguard was the intended and direct beneficiary of the contract between Man Capital and Robinson.  The contract provided that Robinson was to "enter into a business relationship directly or indirectly with [Man Capital] regarding the strategy of OTS Topco Ltd (a Hong Kong entity) and its subsidiaries known generally under the trading name of Vanguard Logistics Services (hereafter referred to as 'VLS')."

118.  Moreover, a motivating purpose for the contract was to benefit Vanguard.  Not only did the contract reference Vanguard specifically, but it explicitly represented that Robinson "expressly undertakes not to contact directly or indirectly any contacts, persons and/or organisations introduced to [Robinson] by [Man Capital] whether *for any other reason than purposes of helping VLS* and its shareholders with its strategy."

119.  Robinson, through his actions and statements as set forth above, breached the terms, covenants, conditions, and agreements of the contract.

-42-

120.  As a result of Robinson's breach, Vanguard has suffered and continues to suffer significant damages in an amount to be proven at trial.

## COUNT VII

### Breach of Fiduciary Duty and Duty of Loyalty

### (Against Defendant Robinson)

121.  Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

122.  Robinson contracted to be a consultant, advisor, board director, and member of the Digital Steering Committee and assumed fiduciary duties to act in the best interests of Vanguard/OTS and guide the development and direction of Vanguard's new online platform and digital strategy.  Robinson participated in board meetings, worked closely with engineers, hired and supervised consultants, had input in product development and direction and budgets, and other management responsibilities.  Given the duties and obligations Robinson accepted—duties that were specifically assumed for the benefit of Vanguard— and in light of the trust that the Mansours and Vanguard had placed in him, Robinson owed Vanguard an undivided loyalty.  Robinson was obligated to act as its fiduciary with the utmost good faith.  Robinson was obligated to work in the best interests of Vanguard.  Robinson's duties arose from contract, common law, and statutory law, including but not limited to California Corporations Code § 309, which required him to perform his duties in good faith, in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

123.  Vanguard was entitled to place its trust and confidence in Robinson and to expect him to act with the utmost good faith toward it in carrying out

Vanguard's business.  Vanguard did rely on Robinson's loyalty and integrity and his faithful performance of his duties and responsibilities.

124.  Robinson took advantage of Vanguard's faith in him in at least the following ways: not performing the duties he owed to Vanguard, acting in conflict of interest, engaging in business for his own company (that he secretly developed while working for Vanguard), on information and belief, intentionally causing distraction and delay to Vanguard's further digital development and release, and concealing his improper conduct.

125.  Robinson knowingly and willingly breached his fiduciary duty and duty of loyalty to Vanguard at least by using Vanguard's data, knowledge and connections for his own benefit, by demanding unreasonable amounts of equity in a "new company," which delayed the development of Vanguard's digital solution, and by actively creating a company to compete with Vanguard—and its profits—while consulting for Vanguard.  Vanguard did not consent to Robinson's conduct described herein.

126.  As a direct and proximate result of Robinson's disloyalty to Vanguard and breach of his duties, Vanguard has been and continues to be harmed.  Vanguard is entitled to its damages, in an amount to be determined at trial.

127.  Vanguard is further entitled to injunctive relief against Robinson and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

128.  Robinson acted in a wanton, willful and outrageous manner in breaching his fiduciary duties and duty of loyalty to Vanguard.  Robinson's conduct as alleged above was outrageous, demonstrating an evil motive and a reckless indifference to Vanguard's rights, entitling Vanguard to enhanced and/or punitive damages in an amount to be proven at trial.

### COUNT VIII

**Promissory Estoppel**

**(Against Defendant Robinson)**

129. Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

130. Robinson clearly and unambiguously promised to Vanguard that he would work in the best interests of Vanguard by helping to further develop and launch Vanguard's new digital business, and Robinson clearly and unambiguously promised that he would not use any Vanguard information in the creation of a competing digital platform.

131. On information and belief, Robinson intended to induce Vanguard to rely on his promises.

132. Vanguard detrimentally, reasonably, and justifiably relied on Robinson's promises and his assurances that he was working to help further develop and launch Vanguard's new digital business and that he would not use any information shared by Vanguard to develop a competing digital platform.

133. Robinson failed to perform his promises. Instead, on information and belief Robinson was intentionally delaying Vanguard's further development and launch of its new digital business and working double-time to prop up his own copycat company, Beacon. While concealing his duplicitous and unlawful scheme, Robinson continued trying to negotiate for baseless and unrealistic percentages of equity in Vanguard's digital business. In direct contravention of his promises, Robinson shifted development away from Vanguard and used

Confidential Information and other knowledge gained from Vanguard to start his own competing company.

134.  Vanguard suffered harm in reliance on Robinson's promises, and Robinson should be estopped from reneging on those promises.

135.  As a result of its reliance on Robinson's promises, Vanguard has suffered damages in an amount to be proven at trial.

<u>**COUNT IX**</u>

**Intentional Interference with Prospective Economic Advantage**

**(Against Both Defendants)**

136.  Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

137.  Vanguard had economic relationships and prospective economic relationships with a vast number of customers, suppliers, shippers, brokers, warehouse operators, and others.

138.  On information and belief, Robinson contacted one or more of Vanguard's customers, suppliers, shippers, brokers, warehouse operators, or others, and made false or misleading statements to them concerning Vanguard's business.

139.  On information and belief, Robinson knew that his false statements were likely to cause Vanguard's customers, suppliers, shippers, brokers, warehouse operators, or others to withdraw, reduce, shorten, delay, or otherwise alter their prospective economic relationships with Vanguard.

140.  Moreover, on information and belief,  Robinson has made public statements such as the traditional freight forwarder model remained "surprisingly analogue," as it was using systems and processes that he believed were slow and inefficient, with "opaque pricing and limited use of technology" and that the goal of Beacon was to

"disrupt the trillion-dollar freight forwarding market by vastly improving

the experience for importers and exporters with a more transparent and smarter shipping product."[3]

141.  In addition, on information and belief, although Robinson represented that he developed a strong pipeline of candidates in areas such as leadership, engineering, and sales for Vanguard, on information and belief, Robinson diverted these candidates to Beacon.

142.  Robinson's disparagement and solicitation further damaged Vanguard's reputation, harmed Vanguard's ability to attract prospective economic relationships, and caused Vanguard to lose valuable development time.

143.  As a direct and proximate result of Defendants' interference, Vanguard has been and continues to be harmed.  Vanguard is entitled to its damages, in an amount to be determined at trial.

144.  Vanguard is further entitled to injunctive relief against Robinson and all those acting in concert or participation with him, including Izmailov and Beacon, remedying their past improper conduct, and preventing such conduct in the future.

145.  Defendants acted in a wanton, willful and outrageous manner in interfering with Vanguard's prospective economic opportunities.  Defendants' conduct as alleged above was willful and malicious and done with the deliberate intent to violate Vanguard's rights, entitling Vanguard to enhanced and/or punitive damages in an amount to be proven at trial.

146.  Vanguard's remedy at law is inadequate to compensate it for the harm Robinson has done.  Vanguard therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secrets, Confidential Information, and other legitimate business interests.

---

[3] *See* https://www.logistik-express.com/uk-digital-freight-forwarder-beacon-attracts-investment-from-amazons-jeff-bezos/.

COMPLAINT

Vanguard's business operates in a competitive market have suffered and will continue to suffer irreparable harm absent injunctive relief

147. All Robinson's actions to intentionally interfere with Vanguard's prospective economic relationships were done on behalf of, and for the benefit of, Beacon.

**COUNT X**

**Violation of California Bus. & Prof. Code § 17200**

**(Against both Defendants)**

148. Vanguard re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

149. The California Unfair Competition Law defines unfair competition to include any "unlawful," "unfair" or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200.

150. On information and belief, Robinson fraudulently misrepresented his intentions to convince Vanguard to enter a business relationship with Robinson and to provide its Confidential Information and other proprietary information to Robinson.

151. Robinson intended for Vanguard to provide its Confidential Information and proprietary information so that Defendants could use Vanguard's information to gain an unfair business advantage. Moreover, on information and belief, Robinson also intended to delay Vanguard's digital development so that Defendants could gain an unfair business advantage. And further, on information and belief, although Robinson represented that he built a strong pipeline of candidates in areas such as engineering and sales for Vanguard, on information and belief, Robinson diverted these candidates to Beacon.

152. By engaging in the wrongful conduct alleged herein, Defendants violated California's Unfair Competition Law by engaging in unlawful, unfair,

-48-

and fraudulently deceptive business acts or practices, which were immoral, unethical, oppressive, unscrupulous, and substantially damaging to Vanguard.

153.  As a result of Defendants' fraudulent and unlawful and conduct, Vanguard has suffered irreparable injury and is entitled to restitution and injunctive relief.  Cal. Bus. & Prof. Code § 17203.

## **PRAYER FOR RELIEF**

Wherefore, Vanguard respectfully seeks the following relief:

154.  Judgment in favor of Vanguard and against Defendant(s) on all of Vanguard's claims asserted in its Complaint;

155.  General, compensatory, and special damages according to proof at trial;

156.  Exemplary and punitive damages according to proof at trial;

157.  Statutory damages, liquidated damages, treble damages, penalties, and all other forms of monetary relief recoverable under applicable law;

158.  The issuance of a preliminary injunction and final, permanent injunction against Defendant(s) requiring the immediate return, and prohibiting any further use, of Vanguard's Confidential Information;

159.  Pre-judgment and post-judgment interest;

160.  Preliminary and permanent injunctive relief;

161.  Disgorgement

162.  Restitution;

163.  Reasonable costs and attorneys' fees, and expenses incurred and expended to date, according to proof at trial, to the extent allowable by applicable law; and

164.  Such other and further relief as the Court deems just and proper.

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2   Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local

3 Rule 38-1 of this Court, Vanguard hereby demands a trial by jury as to all issues

4 so triable.

5

6 Dated:  October 27, 2020   Respectfully Submitted,

7           WILMER CUTLER PICKERING HALE AND

8            DORR LLP

9           By: */s/* Christopher T. Casamassima

10

11           Christopher T. Casamassima (SBN 211280)
             chris.casamassima@wilmerhale.com

12           Alix Pisani (SBN 312263)
             alix.pisani@wilmerhale.com

13           WILMER CUTLER PICKERING
           HALE AND DORR LLP

14           350 South Grand Avenue, Suite 2400
           Los Angeles, CA 90071

15           Telephone: +1 213 443 5300
           Facsimile: +1 213 443 5400

16           Thomas L. Strickland (*pro hac vice forthcoming*)
             thomas.strickland@wilmerhale.com

17           David W. Bowker (SBN 200516)
             david.bowker@wilmerhale.com

18           WILMER CUTLER PICKERING
           HALE AND DORR LLP

19           1875 Pennsylvania Ave NW
           Washington, DC 20006

20           Telephone: +1 202 663 6000
           Facsimile: +1 202 663 6363

21

22

23

24

25

26

27

28

-50-

COMPLAINT